# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ' | |
| | ' | |
| V. | ' | No. SA-21-CR-124-XR |
| | ' | |
| MICHAEL ANGELO PADRON | ' | |

## ORDER

On this day came on to be considered Padron's Motion for Judgment of Acquittal pursuant to FED. R. CRIM. P. 29 and alternative Motion for a New Trial pursuant TO FED. R. CRIM. P. 33 (Dkt. No. 169). After careful consideration, the Court **DENIES** the motion.

## BACKGROUND

Padron was found guilty by a jury of conspiracy to commit wire fraud and to defraud the government in violation of 18 U.S.C. § 371 and six counts of wire fraud in violation of 18 U.S.C. § 1343. He was acquitted by the jury on two counts of wire fraud.

Blackhawk Ventures received various contracts that were set aside for service-disabled veterans. Padron was never a veteran, much less a service-disabled veteran. Accordingly, Padron could not be the majority owner of Blackhawk and receive an award of one of these set-aside contracts. The government brought forth numerous witnesses who testified that, although for "paper purposes," a service-disabled veteran, Ruben Villareal, was named the majority owner of Blackhawk, in reality, the day-to-day major business decisions were actually made by Padron.

Initially, Brian Dudley was installed as the "paper" majority owner of Blackhawk. On paper he owned 51% of the company, with Michael Wibracht and Padron owning the remaining 49% of the company. Dudley testified that he paid no monies to obtain his majority interest in the company. He further testified that Wibracht informed him that Padron did not want him to be in

charge of anything and that he was only a majority owner on paper.  Dudley testified that Padron removed him as majority owner and replaced him with Ruben Villareal.

Villareal was working as a used car salesman when he met Padron.  Padron hired him to work for Blackhawk and ultimately made him President and an owner.  Villareal likewise testified that he did not pay any monies to Wibracht or Padron to assume any ownership interest.

## STANDARD OF REVIEW

"The jury's verdict will be affirmed 'if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt.'  In assessing evidentiary sufficiency, [courts] do 'not evaluate the weight of the evidence or the credibility of the witnesses, but view the evidence in the light most favorable to the verdict, drawing all reasonable inferences to support the verdict.'" *United States v. Seekins*, No. 21-10556, 2022 WL 3644185, at *1 (5th Cir. Aug. 24, 2022) (assessing the standard under FED. R. CRIM. P. 29).

The judge's ability to grant a motion for new trial under FED. R. CRIM. P. 33 and "override the jury verdict exists only when the evidence weighs 'heavily against the verdict.'  And the authority should be exercised only when the verdict may have resulted in a 'miscarriage of justice.'" *United States v. Crittenden*, 46 F.4th 292, 297 (5th Cir. 2022).

## ANALYSIS

Defendant argues that Villareal did in fact do real work running the company.  Indeed, it is uncontested that Villareal did perform some work, but the relevant question is whether he *controlled* Blackhawk.  The Government's witnesses testified that Padron retained control over Villareal's salary, which contracts to bid upon, and the amount of the bids.  Padron and others provided bonding assistance to Blackhawk—circumstantial evidence that he was financially

concerned with its performance and not the passive observer he now contends.  Padron argues that the bonding assistance does not constitute disqualifying control over the business.  Padron, however, fails to recognize that this circumstantial evidence was but one piece of evidence the jury could have considered, along with the testimony of all the witnesses in the case.  In addition, the evidence in this case revealed that Padron received kickbacks on the Blackhawk bonding commissions and kept for himself dividend checks intended for Blackhawk.  In addition, the unchallenged evidence established that Blackhawk received a tax refund and Villareal was instructed by Padron to turn over those monies in installments to Padron.

Padron argues that his former partners are the real villains in this case and that the jury should have disregarded their testimony.  The fact remains that the jury considered the testimony of all the witnesses in this case presented by both the Government and Padron and chose to disbelieve Padron's witnesses and credit the testimony of the witnesses proffered by the Government.  Padron also notes that he sought the advice of an attorney on how to "legitimize" Blackhawk after it was challenged as not qualifying as a service-disabled veteran owned business under the Dudley tenure. He argues that, based on this advice, Blackhawk became a qualified business under the Villareal regime as a matter of law.  However, whether Blackhawk was *actually* owned by a service-disabled veteran is properly established by determining whether the management and daily business operations were controlled by a service-disabled veteran, not whether "paper" had been created to show that Villareal held 51% of the stock.  The jury was allowed to pierce the paper and determine whether Villareal ever paid any monies for his stock in this ongoing, successful business.  The jury further agreed with the Government's position that Padron managed the truly significant parts of Blackhawk, such as salaries, whether to bid on projects, and what the company's bid amount would be.   Regarding day-to-day business

operations, the unchallenged testimony was that Padron did not even give Villareal access to the company's checking account.  As to Padron's argument that Wibracht was the true villain in this scheme, the jury was free to determine that both Padron and Wibracht were co-conspirators.

Padron also argues that no jury could have found that he acted with an intent to defraud. The jury, however, heard testimony that, prior to the creation of Blackhawk, Padron had participated in a set-aside program for veterans using his company called MAPCO.  Padron installed Brian Dudley as the service-disabled veteran for purposes of bidding and receiving government contracts.   The Small Business Administration ultimately challenged this arrangement.  Accordingly, Padron was aware of what he was doing, and Padron was advised by his own lawyer about the control requirements under the SDVOSB program.

Regarding the substantive wire fraud counts, Padron essentially relies upon the arguments restated above.  He further argues that there was no evidence that he transmitted or caused to be transmitted any of the documents relied upon in the six counts.

To sustain these convictions the Government was only required to show that the wires were a foreseeable consequence of the fraud scheme.  *United States v. Snyder*, 505 F.2d 595, 601 (5th Cir. 1974).  The evidence demonstrated that Blackhawk transmitted three electronic invoices (counts 4, 5 and 6) to the Department of Veterans Affairs for payment on contracts they were awarded through the service-disabled set-aside program.  Counts 7, 8, and 9 related to Blackhawk receiving funds from the U.S. Treasury as a result of submitting the invoices.  The fact that Padron did not personally transmit the invoices or personally receive the payments does not absolve him. *See id.*, 505 F.2d at 601 ("[The defendant] is guilty of the substantive offense even if he made no calls himself. The trial court properly denied the motion for acquittal.").

Padron also argues that since there was no evidence that any of his co-conspirators personally transmitted the invoices or received the payments, he cannot be held liable under *Pinkerton v. United States*, 328 U.S. 640 (1946).  The Government responds that after Villarreal departed the company, Padron transferred his nephew, Ethan Padron, from MAPCO to Blackhawk, and Adriane Hilario into a position at Blackhawk.  These individuals caused the invoices to be sent to the Government.  This chain of events serves as further evidence that Padron controlled Blackhawk.  False Form 355s were submitted by Blackhawk.  Any argument that Padron had to play a direct role in transmitting the wire is incorrect.  *See United States v. Jensen*, 41 F.3d 946, 955–56 (5th Cir. 1994) ("under the *Pinkerton* rule '[a] party to a conspiracy may be held responsible for a substantive offense committed by a coconspirator in furtherance of a conspiracy, even if that party does not participate in or have any knowledge of the substantive offense.'").

The Government was required to prove that Padron had the specific intent to defraud the United States. *See United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996) ("The intent necessary for wire fraud is the specific intent to defraud or deceive, although proof of such intent can arise 'by inference from all of the facts and circumstances surrounding the transactions.'"). Sufficient evidence was presented to the jury to allow it to reach a guilty verdict.

Padron also argues that he is entitled to an acquittal because the relevant regulations under 13 C.F.R. 125.12 and .13 are unconstitutionally vague.  In relevant part, the regulations state:

**125.12 Who does SBA consider to own an SDVO SBC?**

Generally, a concern must be at least 51% unconditionally and directly owned by one or more service-disabled veterans. More specifically:

(a) Ownership must be direct. Ownership by one or more service disabled veterans must be direct ownership. A concern owned principally by another business entity that is in turn owned and controlled by one or more service-disabled veterans does not meet this requirement. Ownership by a trust, such as a living trust, may be treated as the functional equivalent of ownership by service-disabled veterans

where the trust is revocable, and service-disabled veterans are the grantors, trustees, and the current beneficiaries of the trust.

(b) Ownership of a partnership. In the case of a concern which is a partnership, at least 51% of aggregate voting interest must be unconditionally owned by one or more service-disabled veterans. The ownership must be reflected in the concern's partnership agreement.

(c) Ownership of a limited liability company. In the case of a concern which is a limited liability company, at least 51% of each class of member interest must be unconditionally owned by one or more service-disabled veterans.

(d) Ownership of a corporation. In the case of a concern which is a corporation, at least 51% of the aggregate of all stock outstanding and at least 51% of each class of voting stock outstanding must be unconditionally owned by one or more service-disabled veterans. In the case of a publicly owned business, not less than 51 percent of the stock (not including any stock owned by an ESOP) must be unconditionally owned by one or more veterans.

***

(f) Change of ownership. A concern may change its ownership or business structure so long as one or more service-disabled veterans own and control it after the change.

(g) Dividends and distributions. One or more service-disabled veterans must be entitled to receive:

> (1) At least 51 percent of the annual distribution of profits paid to the owners of a corporation, partnership, or limited liability company concern;

> (2) 100 percent of the value of each share of stock owned by them in the event that the stock or member interest is sold; and

> (3) At least 51 percent of the retained earnings of the concern and 100 percent of the unencumbered value of each share of stock or member interest owned in the event of dissolution of the corporation, partnership, or limited liability company.

> (4) An eligible individual's ability to share in the profits of the concern must be commensurate with the extent of his/her ownership interest in that concern.

### § 125.13 Who does SBA consider to control an SDVO SBC?

(a) General. To be an eligible SDVO SBC, the management and daily business operations of the concern must be controlled by one or more service-disabled veterans (or in the case of a veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran). Control by one or more service-disabled

veterans means that both the long-term decisions making and the day-to-day management and administration of the business operations must be conducted by one or more service-disabled veterans (or in the case of a veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran).

(b) Managerial position and experience. A service-disabled veteran (or in the case of a service-disabled veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran) must hold the highest officer position in the concern (usually President or Chief Executive Officer) and must have managerial experience of the extent and complexity needed to run the concern. The service-disabled veteran manager (or in the case of a veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran) need not have the technical expertise or possess the required license to be found to control the concern if the service-disabled veteran can demonstrate that he or she has ultimate managerial and supervisory control over those who possess the required licenses or technical expertise.

(c) Control over a partnership. In the case of a partnership, one or more service-disabled veterans (or in the case of a veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran) must serve as general partners, with control over all partnership decisions.

(d) Control over a limited liability company. In the case of a limited liability company, one or more service-disabled veterans (or in the case of a veteran with permanent or severe disability, the spouse or permanent caregiver of such veteran) must serve as managing members, with control over all decisions of the limited liability company.

(e) Control over a corporation. One or more service-disabled veterans (or in the case of a veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran) must control the Board of Directors of the concern.

> (1) SBA will deem service-disabled veteran individuals to control the Board of Directors where:
>
> > (i) A single service-disabled veteran individual owns 100% of all voting stock of an applicant or concern;
> >
> > (ii) A single service-disabled veteran individual owns at least 51% of all voting stock of an applicant or concern, the individual is on the Board of Directors and no super majority voting requirements exist for shareholders to approve corporation actions. Where super majority voting requirements are provided for in the concern's articles of incorporation, its by-laws, or by state law, the service-disabled veteran individual must own at least the percent of the voting stock needed to overcome any such super majority voting requirements; or

(iii) More than one service-disabled veteran shareholder seeks to qualify the concern (i.e., no one individual owns 51%), each such individual is on the Board of Directors, together they own at least 51% of all voting stock of the concern, no super majority voting requirements exist, and the service-disabled veteran shareholders can demonstrate that they have made enforceable arrangements to permit one of them to vote the stock of all as a block without a shareholder meeting. Where the concern has super majority voting requirements, the service-disabled veteran shareholders must own at least that percentage of voting stock needed to overcome any such super majority ownership requirements. In the case of super majority ownership requirements, the service-disabled veteran shareholders can demonstrate that they have made enforceable arrangements to permit one of them to vote the stock of all as a block without a shareholder meeting.

\*\*\*

(i) Control by non-service-disabled veterans. Non-service-disabled veteran individuals or entities may not control the firm. There is a rebuttable presumption that non-service-disabled veteran individuals or entities control or have the power to control a firm in any of the following circumstances, which are illustrative only and not inclusive:

(1) The non-service-disabled veteran individual or entity who is involved in the management or ownership of the firm is a current or former employer or a principal of a current or former employer of any service-disabled veteran individual upon whom the firm's eligibility is based. However, a firm may provide evidence to demonstrate that the relationship does not give the non-service-disabled veteran actual control over the concern and such relationship is in the best interests of the concern.

(2) One or more non-service-disabled veterans receive compensation from the firm in any form as directors, officers or employees, including dividends, that exceeds the compensation to be received by the highest-ranking officer (usually CEO or President). The highest ranking officer may elect to take a lower amount than the total compensation and distribution of profits that are received by a non-veteran only upon demonstrating that it helps the concern.

(3) In circumstances where the concern is co-located with another firm in the same or similar line of business, and that firm or an owner, director, officer, or manager, or a direct relative of an owner, director, officer, or manager of that firm owns an equity interest in the concern.

(4) In circumstances where the concern shares employees, resources, equipment, or any type of services, whether by oral or written agreement

with another firm in the same or similar line of business, and that firm or an owner, director, officer, or manager, or a direct relative of an owner, director, officer, or manager of that firm owns an equity interest in the concern.

(5) A non-service-disabled veteran individual or entity, having an equity interest in the concern, provides critical financial or bonding support.

(6) In circumstances where a critical license is held by a non-service-disabled individual, or other entity, the non-service-disabled individual or entity may be found to control the firm. A critical license is considered any license that would normally be required of firms operating in the same field or industry, regardless of whether a specific license is required on a specific contract.

(7) Business relationships exist with non-service-disabled veteran individuals or entities which cause such dependence that the applicant or concern cannot exercise independent business judgment without great economic risk.

(j) Critical financing. A non-service-disabled veteran individual or entity may be found to control the concern through loan arrangements with the concern or the service-disabled veteran(s). Providing a loan or a loan guaranty on commercially reasonable terms does not, by itself, give a non-service-disabled veteran individual or entity the power to control a firm, but when taken into consideration with other factors may be used to find that a non-service-disabled firm or individual controls the concern.

Padron argues that the regulations do not define "long-term decision making" or "day-to-day management" and thus his conviction was based on arbitrariness that violates the Due Process Clause. The Government argues that Padron never raised this argument before trial, and that accordingly he has waived this argument. Alternatively, it argues that he was not convicted for violating these regulations, but rather he was convicted of conspiracy to commit wire fraud. Accordingly, it argues that courts have routinely rejected vagueness challenges to 18 U.S.C. § 371, even when those criminal prosecutions involve defrauding federal administrative programs. Dkt. No. 170 at 15–16 (citing *United States v. Morosco*, 822 F.3d 1, 5 (1st Cir. 2016) (rejecting vagueness challenge to a § 371 prosecution for defrauding the Department of Housing and Urban Development's housing inspection process); *United States v. Cueto*, 151 F.3d 620, 636 (7th Cir.

1998) ("The fact that § 371 has been applied to agreements not expressly anticipated by Congress nor specifically articulated in the statute does not demonstrate ambiguity nor does it create vagueness problems."); *United States v. Garcia*, No. C-09-236, 2009 WL 1473386, at *6 (S.D. Tex. May 26, 2009) ("While Medicare regulations are admittedly complex, the statutes defendants are charged with violating provide relatively straightforward descriptions of fraud and conspiracy to commit fraud, and thus provide defendants with sufficient notice as required by the Fifth Amendment.")).   Again, in the alternative, the Government argues that the regulations are extensive and provide ample notice about what control means.

The Court agrees with the Government that Padron was not found guilty of violating the regulations, but rather was found guilty of conspiracy to commit wire fraud.  In addition, the evidence in this case was that Padron was well aware of the requirements to receive these disabled veteran set-aside contracts and attempted to "paper" around these requirements.  To the extent that Padron is arguing that his indictment was vague and accordingly violated his rights to due process, that argument is also without merit.

Padron further argues that the Court erred in the following respects: (1) failing to include a multiple conspiracies instruction, (2) improperly warning defense witness Robert Hinojosa of his Fifth Amendment rights outside the presence of the jury and thus intimidating the witness,[1] and (3) sua sponte raising relevance objections during Defendant's case-in-chief and overruling Defendant's objections without providing defense counsel an opportunity to respond.  Padron argues that these interventions gave an impression of judicial bias.  Finally, Padron argues that the Court improperly limited his ability to impeach by using 302 statements written by government agents.

---

[1] Padron argues that Hinojosa would have testified that Brian Taylor and Wibracht attempted to use him as a token or figurehead of a company called Hinocor for the purposes of receiving government set-aside contracts.

**(1)    Multiple Conspiracies**

Padron was not charged with participating in multiple conspiracies.  Padron argues that the testimony reflecting that he received kickbacks from the bonding insurance agreements gave the jury the impression that if he did engage in that act, he also engaged in the "main" conspiracy.  A multiple conspiracy instruction is not required where "there is no threat that [the defendant] was erroneously convicted of [the charged] conspiracy . . . *because* the jury found he had participated only in" an uncharged conspiracy. *United States v. Toro*, 840 F.2d 1221, 1237 (5th Cir. 1988) (emphasis in original). The Court's instructions expressly cautioned the jury that the defendant was on trial for only the acts charged.  The testimony about the bond kickbacks was only allowed as relevant testimony as to whether Padron controlled Blackhawk.  The Court's instructions "informed the jury of their responsibility to convict the defendant only for the indicted conspiracy offense and thus additionally offset" any possibility that the jury convicted Mr. Padron based on an uncharged conspiracy. *See Toro*, 840 F.2d at 1237.

**(2)    Hinojosa**

Padron's counsel sought to question Hinojosa about how Wibracht and, another one of Padron's co-conspirators, Brian Taylor, allegedly attempted to use him as a figurehead owner of Hinocor for the purposes of receiving government set-aside contracts.  Hinojosa was given a cubicle at a Padron-related company, Federal Management Solutions ("FMS"), for purposes of setting up Hinocor.  Outside the presence of the jury the Court merely advised Hinojosa, a former police officer, not to say anything that may incriminate him.  Defense counsel improperly suggested that the Court had unilateral authority to provide Hinojosa with immunity to testify.  The Court declined defense counsel's suggestion.  As the Fifth Circuit has stated, a district judge is "charged with the firm duty to see that the rights of all are upheld—the defendants, *the witnesses*

and the public. Whether and to whatever extent it may be the duty of the trial judge to caution a witness about his Fifth Amendment rights, a careful one never hesitates." *United States v. Wilcox*, 450 F.2d 1131, 1139 (5th Cir. 1971) (emphasis added). Any argument that Padron is entitled to a new trial because the Court outside the presence of the jury merely advised Hinojosa to be cautious in his testimony so that he does not potentially incriminate himself is denied.

**(3)      Court's sua sponte objections**

The Court has broad authority to oversee the presentation of evidence. *See* FED. R. EVID. 611(a). That authority includes wide latitude to impose reasonable limits on repetitive or marginally relevant testimony. *United States v. Gray*, 105 F.3d 956, 964–65 (5th Cir. 1997) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). Given the court's broad discretion, a claim like the one Mr. Padron raises here requires that a defendant "show that the limitations imposed upon his counsel's cross-examination were clearly prejudicial." *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993). And whether limits were "clearly prejudicial" requires consideration of "the overall strength of the prosecution's case, the circumstances surrounding the challenged testimony, the importance of that testimony, and its corroboration or contradiction elsewhere at trial." *Gray*, 105 F.3d at 965. The Court properly exercised its discretion here.  For example, questions about what Tejano music Defendant and a witness were listening to during a business trip were clearly not relevant.  Padron has not shown clear prejudice from the Court's limited interventions over a lengthy trial.

**(4)      302 statements**

Agent interview reports are not the witness's statements.  *United States v. Williams*, 998 F.2d 258, 269 (5th Cir. 1993).  Nevertheless, by agreement, the parties read into the record before the jury portions of the agent interview reports that defense counsel argued were inconsistent with

the witness's trial testimony.  Padron now complains that because he was not also allowed to read the trial testimony to the jury alongside the prior allegedly inconsistent statement, the Court violated his Sixth Amendment right to confrontation.  The Fifth Circuit has held that "[t]he confrontation clause of the Constitution guarantees an opportunity for effective cross-examination, but not in whatever way or to whatever extent the defendant wishes." *Gray*, 105 F.3d at 965. The jury was apprised of the impeachment evidence that Mr. Padron sought to present, and he suffered no infringement of his Confrontation Clause rights. *See United States v. Skelton*, 514 F.3d 433, 439 (5th Cir. 2008) ("[T]he Confrontation Clause is generally satisfied when the defendant has been 'permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.'" (quoting *Restivo*, 8 F.3d at 278)).

**(5)      Taylor and alleged perjurious statements**

After trial, Padron received a call from Brian Taylor, wherein Taylor said he was sorry for what happened to Padron and that "they made me do it."  Padron argues that this was an admission by Taylor that he made perjurious statements at trial and that somehow the Government was complicit in securing false testimony.  In an affidavit and later on the witness stand at a November 14, 2022, hearing, Taylor explained that Padron was taking the phone call out of context, that he merely was saying goodbye to Padron in anticipation of his sentencing, and that he testified at trial because he was subpoenaed to do so.  Taylor asserted that all his trial testimony was truthful.  Any motion for acquittal or new trial based on alleged false testimony by Taylor is denied.

## CONCLUSION

Padron's Motion for Judgment of Acquittal pursuant to FED. R. CRIM. P. 29 and alternative Motion for a New Trial pursuant to FED. R. CRIM. P. 33 (Dkt. No. 169) is **DENIED**.

It is so **ORDERED**.

**SIGNED** November 28, 2022.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE